**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO**

JULIAN ROMERO,

Plaintiff,

v.

                                                        Case No. _____

BOARD OF COUNTY COMMISSIONERS
 OF RIO ARRIBA COUNTY; ROADRUNNER
HEALTH SERVICES, LLC; DR. LEVI MAES,
Medical Director at Rio Arriba County Detention
Center for Roadrunner Health Services, in his
individual capacity; WEXFORD HEALTH
SOURCES, INC., a foreign for-profit company
doing business in New Mexico; PAUL SWOBODA,
MD, CNMCF Medical Director for Wexford,
in his individual capacity; JOYCE RODRIGUEZ,
RN, in her individual capacity; WENCE ASONGANYI,
Health Services Administrator for New Mexico
Corrections Department, in his individual capacity;
ALISHA TAFOYA LUCERO, as Secretary of New
Mexico Corrections Department, in her individual
capacity; ROBERT NILIUS, Warden of Central
New Mexico Correctional Facility, in his individual
capacity; JOSE L. GALLEGOS, Warden of Rio Arriba
County Adult Detention Center, in his individual
capacity; and JOHN/JANE DOES 1-10, in their
individual capacities,

Defendants.

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**JURY TRIAL DEMANDED**

Plaintiff Julian Romero, by and through his undersigned counsel, alleges as follows:

**JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this

action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

1

2.      This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3)-(4), which confers original jurisdiction over suits to redress the deprivation, under color of state law, of any right, privilege, or immunity secured by the Constitution or by any Act of Congress.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

**PARTIES**

4.      Plaintiff Julian Romero is a 45-year-old male who, during early 2023, was a pretrial detainee housed at the Rio Arriba County Adult Detention Facility. Due to his serious medical conditions, Plaintiff was transferred to the Central New Mexico Correctional Facility under a Criminal Justice ("CJ") hold while still pretrial.

5.      Defendant Board of County Commissioners of Rio Arriba County ("Rio Arriba County") is a political subdivision of the State of New Mexico that owned, operated, supervised, directed, and controlled the Rio Arriba County Adult Detention Center ("RACDC").

6.      Defendant Roadrunner Health Services, LLC ("Roadrunner"), is a limited liability company that contracted with Rio Arriba County to provide medical services to detainees at Rio Arriba County Adult Detention Facility during the relevant time period.

7.      Defendant Dr. Levi Maes was the Medical Director for Roadrunner Health Services at Rio Arriba County Detention Center during the relevant period. He personally acknowledged in writing that Mr. Romero had active osteomyelitis requiring IV antibiotics and that the facility could not provide such care, yet failed to ensure timely transfer or advocate for Mr. Romero's immediate medical needs. He acted under color of state law and is sued in his individual capacity.

2

8.      Defendant Wexford Health Sources, Inc. ("Wexford"), at all material times, was a private, for-profit corporation doing business in New Mexico. Although Wexford's prior contract was cancelled by NMCD after auditors found serious deficiencies in delivery of healthcare, Wexford was again selected by NMCD in October 2019 to provide medical care to individuals housed in New Mexico state correctional facilities, including CNMCF, pursuant to NMCD's Professional Services Contract No. 20-770-1200-0043. Under this contract, Wexford assumed responsibility for providing and coordinating medical care for individuals housed at those facilities, including ensuring that such care meets constitutional minimum standards. Wexford and its employees acted under color of state law and are subject to suit under 42 U.S.C. § 1983.

9.      Upon information and belief, Defendant Paul Swoboda, MD, was the Medical Director at CNMCF during the relevant period. He was responsible for supervising clinical care, reviewing orders by other providers, and ensuring timely referral to outside providers. He acted under color of state law and is sued in his individual capacity.

10.     Defendant Joyce Rodriguez, RN, was a registered nurse at CNMCF who was responsible for providing nursing care to Mr. Romero and who had direct contact with Mr. Romero during the critical period of February 9-17, 2023. Despite Mr. Romero's obvious worsening neurological symptoms, Defendant Rodriguez failed to escalate his care or secure immediate emergency referral. She acted under color of state law and is sued in her individual capacity.

11.     Defendant Wence Asonganyi, BSN, MSc, was at all relevant times NMCD's Health Services Administrator and the head of NMCD's Health Services Bureau. In this role, he was charged with overseeing compliance by Wexford with NMCD policies and the PSC, monitoring facility staffing levels, reviewing daily hospital reports, overseeing and making final determinations about off-site medical referrals, and ensuring that appropriate care plans were

3

implemented when patients returned from outside hospitals. He acted under color of state law and is sued in his individual capacity.

12.     Defendant Alisha Tafoya Lucero was at all relevant times the Secretary of NMCD. As Secretary, she exercised final policymaking authority over NMCD policies, including NMCD's oversight of Wexford's medical care, NMCD's contracts with private medical providers, the development and implementation of medical care policies, and the oversight and enforcement of compliance with constitutional standards. She acted under color of state law and is sued in her individual capacity.

13.     Defendant Robert Nilius was the Warden of Central New Mexico Correctional Facility during the relevant period. As Warden, he was responsible for overall facility operations, including ensuring adequate security staffing for medical transports, overseeing emergency response procedures, and ensuring compliance with NMCD policies requiring immediate emergency transports. Warden Nilius received three notices of claims alerting him to Mr. Romero's serious medical needs. At critical times when Mr. Romero required emergency transport, Warden Nilius failed to act to arrange the requisite logistics and security for transport, delaying and precluding needed emergency care. Following Mr. Romero's surgeries and hospitalizations, Nilius approved Romero's placement in restrictive/segregated housing away from medical staff because of gang affiliation, despite Mr. Romero's ongoing post-surgical serious medical needs. He acted under color of state law and is sued in his individual capacity.

14.     Defendant Jose L. Gallegos was the Detention Administrator of the Rio Arriba County Adult Detention Center during the relevant period. As Detention Administrator, Gallegos was responsible for overall facility operations, including ensuring constitutionally adequate medical care for detainees, overseeing the facility's medical services contract with Roadrunner

4

Health Services, and coordinating with the courts and other detention facilities regarding inmate transfers. On February 3, 2023, a state court entered an order expressly finding that "Julian Romero requires specialized medical care and the Rio Arriba County Detention Center is not properly equipped to provide such care," and ordering Mr. Romero's transfer to Central New Mexico Correctional Facility. Defendant Gallegos signed the proposed transfer order as the RACDC detention administrator and submitted it to the state court for entry, thereby confirming his knowledge of the court's findings and the detention center's inability to provide necessary medical care. That order followed a written admission by Roadrunner's Medical Director, Dr. Levi Maes, that Mr. Romero had active spinal osteomyelitis requiring IV antibiotics that the facility was "unable to provide." Despite actual knowledge of Mr. Romero's serious medical needs and the facility's acknowledged incapacity, Gallegos delayed the transfer and failed to arrange emergency hospital care. Mr. Romero remained detained at RACDC without IV antibiotics from January 13 through February 9, 2023, including six days after the court ordered his transfer to CNMCF, allowing his infection to worsen and substantially increasing the risk of permanent neurological injury. Gallegos acted under color of state law and is sued in his individual capacity.

15.     Defendants John/Jane Does 1–10 are employees, agents, staff, administrators, utilization management personnel, corporate medical decisionmakers, medical providers, nurses, correctional officers, and other individuals, employed by or acting under color of state law for the named Defendants, whose identities are currently unknown but who participated in, influenced, authorized, delayed, or failed to prevent the constitutional violations alleged herein.

16.     At all relevant times, Defendants and their employees, agents, and staff acted under color of state law and are subject to suit under 42 U.S.C. § 1983.

5

17.    Plaintiff was a pretrial detainee during his confinement at Rio Arriba County Adult Detention Center and during his subsequent confinement at Central New Mexico Correctional Facility while on a CJ hold. Because Plaintiff was a pretrial detainee during these periods, his constitutional right to adequate medical care arises under the Fourteenth Amendment Due Process Clause.

## BACKGROUND FACTS

### Medical Standards: Spinal Osteomyelitis as a Serious Medical Need

18.    Spinal osteomyelitis is a medical emergency requiring immediate IV antibiotics, urgent diagnostic evaluation, close monitoring, and timely escalation of care, including surgical consultation when indicated, to prevent irreversible neurological damage, sepsis, paralysis, or death.

19.    When untreated or when treatment is delayed, spinal osteomyelitis can result in irreversible spinal destruction, permanent neurological impairment, paralysis, and even death. Symptoms include back pain that worsens upon moving and does not improve with over-the-counter medications, numbness, mobility impairments, and weakness.

20.    Intravenous (IV) drug use significantly increases the risk of spinal infections, which are known to cause severe morbidity, permanent disability, and elevated mortality rates. The rise in spinal infections associated with IV drug use mirrors the broader opioid epidemic and underscores their importance as a public health issue.

21.    Severe back pain accompanied by inability to ambulate, neurological deficits, and red-flag risk factors such as intravenous drug use requires urgent workup for spinal infection, including vertebral osteomyelitis and spinal epidural abscess, with MRI as the preferred diagnostic imaging modality.

**Legal Standards**

22.     The Fourteenth Amendment Due Process Clause governs claims by pretrial detainees challenging the denial or delay of medical care. The Fourteenth Amendment's Due Process Clause entitles pretrial detainees to the same standard of medical care that the Eighth Amendment requires for convicted inmates. *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020). Under that standard, jail guards cannot act with deliberate indifference to a pretrial detainee's serious medical needs. *Id*. To establish a violation of rights under the Fourteenth Amendment Due Process Clause, a pretrial detainee must satisfy objective and subjective prongs of the test. *Id*.

23.     A pretrial detainee establishes unconstitutional denial or delay of medical care by showing deliberate indifference to a serious medical need. Deliberate indifference contains both an objective and a subjective component.

24.     The objective prong is satisfied when the medical need is sufficiently serious. A medical need is sufficiently serious where a physician has diagnosed the condition and directed further treatment, or where the need for a doctor's attention would be obvious to a lay person. Delays in medical care can also satisfy the objective prong when the delay causes substantial harm, including permanent injury or considerable pain.

25.     The subjective prong is satisfied when a defendant is aware of a substantial risk of serious harm to the detainee and chooses to disregard that risk. A plaintiff may establish awareness through circumstantial evidence, including evidence that the risk was obvious.

26.     Deliberate indifference may be shown where a defendant fails to take reasonable measures to provide necessary care, fails to secure emergency treatment, or acts as a gatekeeper

7

who delays or obstructs access to hospital-level care or specialized treatment that the facility cannot provide.

## FACTUAL ALLEGATIONS

### Plaintiff's Medical Background

27. At all times relevant to this Complaint, Plaintiff had chronic spinal osteomyelitis/discitis with epidural abscess affecting his L3-L4-L5 vertebrae. Plaintiff also had a seizure disorder since age 14 stemming from traumatic brain injury and other serious medical conditions which required ongoing care.

28. Plaintiff has a past medical history of intravenous drug use, which was documented in his medical records and known to Defendants responsible for his medical care. This history placed Plaintiff at heightened risk for severe, recurrent, and incompletely treated spinal infections and made the consequences of delayed or interrupted treatment for his already-diagnosed spinal osteomyelitis particularly grave and foreseeable.

29. On July 7-8, 2022, Plaintiff presented to Presbyterian Hospital with severe symptoms requiring Level 5 Emergency Department care, including MRI of lumbar and cervical spine with contrast, blood cultures, and other diagnostic testing.

30. Plaintiff underwent surgery on July 10, 2022 (procedure code 63267 - "Surgery Nervous System") and remained hospitalized for approximately 28 days through August 4, 2022, for treatment of spinal osteomyelitis at the L3/L4-L5 levels with MRSA bacteria.

### Rio Arriba County Detention

31. On January 13, 2023, Plaintiff Julian Romero was arrested and booked into the Rio Arriba County Adult Detention Center ("RACDC"). At the time of booking, Plaintiff entered custody with a known, active spinal infection and ongoing symptoms requiring urgent hospital-

8

level care, including continuous intravenous ("IV") antibiotic treatment and medical monitoring to prevent progression of infection, neurological compromise, permanent disability, and death.

32.     From January 13, 2023 through February 9, 2023, Plaintiff remained continuously detained at RACDC while Defendants failed to provide the medically necessary IV antibiotic treatment required to prevent catastrophic progression of his spinal infection. During this period, Plaintiff's untreated infection continued to advance daily, placing him at ongoing and escalating risk of irreversible spinal destruction, spinal cord compression, and permanent neurological injury.

33.     On January 23, 2023, imaging confirmed osteomyelitis, objectively establishing that Plaintiff suffered from an active and life-threatening spinal infection requiring urgent intervention.

34.     Following confirmation of osteomyelitis, Defendant Dr. Levi Maes, acting as Medical Director for Roadrunner Health Services at RACDC, acknowledged in writing that "Mr. Romero currently has active osteomyelitis of the spine as per CT scan and requires IV antibiotics for an extended period of time" and further admitted that "The medical department at the RACDC is unable to provide IV antibiotics for him and recommends him being placed in a facility that can accommodate his medical needs."

35.     Despite this explicit written acknowledgment that Plaintiff required IV antibiotics and that RACDC lacked the capability to provide them, Defendants did not transport Plaintiff to a hospital to initiate the necessary treatment. Instead, Defendants continued to confine Plaintiff at RACDC while knowingly withholding essential medical care, allowing the infection to progress unchecked.

36.     A court order then expressly found that Plaintiff "requires specialized medical care" and that RACDC "is not properly equipped to provide such care." The court ordered Plaintiff

transferred to Central New Mexico Correctional Facility ("CNMCF") as the closest facility capable of providing safe housing and supervision required by Plaintiff's serious medical needs.

37.     Even after the court's explicit order and Defendants' admitted incapacity, Defendants continued to detain Plaintiff at RACDC without initiating IV antibiotics or arranging emergency hospital treatment.

38.     Plaintiff remained without constitutionally adequate medical care for an additional six days after the court order, while his spinal infection continued to worsen and his risk of catastrophic neurological injury continued to escalate.

39.     Plaintiff was not transferred out of RACDC until February 9, 2023. By that time, Plaintiff's untreated spinal osteomyelitis had progressed substantially, setting in motion the catastrophic deterioration that culminated in his emergency hospitalization and prolonged disability.

40.     Defendants' continuous failure and refusal to provide necessary treatment from January 13 through February 9, 2023, despite confirmed diagnosis, explicit written admissions of incapacity, and a court order requiring transfer for specialized medical care, constituted deliberate indifference to Plaintiff's serious medical needs and subjected Plaintiff to ongoing unconstitutional punishment in violation of the Fourteenth Amendment.

### CNMCF Detention

41.     On February 9, 2023, Plaintiff was transferred to NMCD custody at Central New Mexico Correctional Facility and immediately placed in the Long Term Care Unit (LTCU) due to his already-diagnosed active spinal osteomyelitis requiring IV vancomycin treatment.

42.     Plaintiff arrived at CNMCF with active osteomyelitis (spinal abscess) documented in his CJ Hold file, transfer paperwork, and court orders, giving Defendants actual knowledge of his serious medical condition requiring immediate and continuous IV antibiotic treatment.

10

43. Defendants NMCD, Wexford, and their agents had actual knowledge of the life-threatening nature of incompletely treated spinal osteomyelitis.

44. Although intravenous antibiotic therapy was initiated upon Plaintiff's arrival at CNMCF on February 9, 2023, Defendants knew that antibiotic treatment alone did not resolve the medical emergency posed by Plaintiff's condition. Defendants knew that spinal osteomyelitis with progressive neurological deficits constitutes a neurosurgical emergency and that worsening symptoms such as loss of ambulation, urinary incontinence, and inability to sit upright require immediate outside hospital evaluation regardless of ongoing antibiotic therapy.

45. Following his initiation on IV antibiotic therapy, Plaintiff exhibited the worsening manifestations of spinal cord compression from osteomyelitis: severe and escalating back pain, progressive lower left leg spasms, inability to stand and bear weight, paresthesia to bilateral legs and buttocks, and ultimately the complete inability to rise to sitting position. At multiple points during this period, Plaintiff's severe pain and inability to ambulate or sit upright were apparent to medical and custody staff alike.

46. Plaintiff was experiencing a medical emergency requiring immediate intervention. Plaintiff's active diagnosis and worsening neurological symptoms did in fact alert CNMCF medical providers that Plaintiff faced a substantial and imminent risk of spinal cord compression and permanent injury.

47. From February 9 through February 17, 2023, Defendants knew that Plaintiff had active spinal osteomyelitis and was experiencing progressive neurological deterioration, including worsening back pain, escalating lower extremity spasms preventing weight-bearing, paresthesia, and urinary incontinence. Despite this knowledge, Defendants, including Dr. Swoboda and

11

Warden Nilius, took no action to escalate Plaintiff's care or arrange emergency transport, and instead waited while his condition continued to worsen.

48.     Defendants did not act until Plaintiff's condition deteriorated to the point that his severe leg spasms and contractures prompted concern for a possible hip dislocation and Plaintiff was unable to rise to a sitting position.

49.     On February 17, 2023, at 13:25, Defendant RN Joyce Rodriguez advised Sergeant Chris Drew that Dr. Swoboda had ordered emergency transport to the hospital due to "spine and lower extremity issues."

50.     At the time the emergency transport was ordered, Plaintiff's spinal osteomyelitis had progressed to cause severe neurological and musculoskeletal impairment. The infection was producing uncontrolled spasms and contractures in Plaintiff's left leg. Plaintiff was unable to rise to a seated position, reflecting a profound loss of motor function. Medical staff documented that his condition was actively worsening.

51.     The Medical Incident Report documented Plaintiff's emergency condition as: "Osteomyelitis of spine Causing Lower extremity Spasms and contracture to DLE at Knee and possibly, hip c possible dislocation. pt unable to get up to sitting position. Worsening of Condition."

52.     The delay in emergency transport violated NMCD policy CD-170101(J)(4), which requires that "urgent or emergency transports be conducted immediately upon the determination by the medical staff that it is necessary."

53.     The emergency transport was only ordered after Plaintiff's condition had progressed to a life-threatening state with complete inability to rise to sitting position, demonstrating

12

Defendants' systematic failure to monitor and treat his serious medical condition during the eight critical days Plaintiff was in their custody at CNMCF.

54.     Upon information and belief, the delay in escalating Plaintiff's care and arranging emergency transport was consistent with Wexford's utilization management and referral approval practices, which required additional authorization before outside hospital care was obtained.

**UNMH Hospitalization: The Catastrophic Result of Delayed Care**

55.     On February 17, 2023, Plaintiff was transported by ambulance to University of New Mexico Hospital, where MRI imaging showed "worsened appearance of osteomyelitis/discitis centered at L4-5 and involving L3-S1 levels. Severe spinal canal stenosis from L3-L5, as well as severe neural foraminal stenoses. Appearance of arachnoiditis and possible subdural empyema. Epidural thickening/enhancement/phlegmon."

56.     Plaintiff remained hospitalized at UNMH for 159 consecutive days from February 17, 2023, through July 28, 2023—a direct consequence of Defendants' delays in providing necessary care.

57.     On March 27, 2023, Plaintiff underwent major spinal surgery including: (1) Cement Augmentation at L1, L2, and L3; (2) L1-Pelvis Posterior Segmental Instrumentation; (3) L1-3 Posterolateral Fusion; (4) L4 and L5 Partial Vertebrectomies; (5) Deformity Correction; (6) Stereotactic Navigation; (7) Fluoroscopy; and (8) Intraoperative Neuromonitoring.

58.     On April 10, 2023, Plaintiff underwent a second major surgery including: (1) Anterior completion of 3-column vertebrectomies at L4 and L5; (2) Spinal Canal Decompression; (3) Placement of Anterior Corpectomy Cage L3-S1; (4) Anterior Arthrodesis L3-S1; (5) Stereotactic Navigation; (6) Fluoroscopy; and (7) Intraoperative Neuromonitoring.

59.    During his hospitalization, Plaintiff suffered serious post-surgical complications including substantial blood loss requiring transfusions, post-operative pneumonia, deep vein thrombosis in his left lower extremity, post-operative ileus, and large retroperitoneal fluid collection/lymphocele requiring multiple drainage procedures and sclerotherapy treatments.

60.    The total medical expenses for Plaintiff's care exceeded $1.6 million.

61.    Had Defendants provided timely IV antibiotic treatment during Plaintiff's 27-day detention at Rio Arriba County (January 13-February 9, 2023), Plaintiff's catastrophic deterioration, extensive surgeries, prolonged hospitalization, and permanent disability could have been prevented.

62.    Likewise, had Defendants at CNMCF taken appropriate action in response to Plaintiff's worsening neurological symptoms while Plaintiff was in their custody from February 9 through 17, 2023, Plaintiff's catastrophic deterioration, extensive surgeries, prolonged hospitalization, and permanent disability could have been prevented.

**Wexford's Corporate Policies: Collegial Review as Patient Safety Hazard**

63.    Since its founding in 1992, Wexford has marketed itself as a company that "focus[es] on nothing but correctional health care." Yet Wexford operates on a corporate model that prioritizes cost-containment over patient care, creating predictable and persistent constitutional violations across NMCD facilities.

64.    Wexford's Illinois Department of Corrections (IDOC) contract, which Wexford cited to NMCD as evidence of "cost-savings" through its "ability to contain offsite care costs," became the subject of the class action *Lippert v. Ghosh*, where court-appointed experts found widespread systemic failures in inmate medical care. *See Lippert v. Ghosh,* No. 1:10-cv-04603

(N.D. Ill. filed July 23, 2010) (a 42 U.S.C. § 1983 prisoner civil rights case alleging unconstitutional conditions of confinement and deliberate indifference to serious medical needs).

65.     One of the most notorious practices identified in the *Lippert* investigations was the systemic delay, denial, and restriction of medically necessary off-site referrals for specialty care and hospitalization through Wexford's so-called "collegial review" process.

66.     "Collegial review" (one of Wexford's proprietary methods of "utilization management") functioned as a gatekeeping tool that prioritized cost containment over patient care, resulting in denials or delays of specialty referrals that were not grounded in evidence-based medicine or patient outcomes. Court-appointed experts concluded that collegial review created "breakdowns in almost every area," including delays in identifying when offsite care was needed and complete absence of timely follow-up once patients returned from outside facilities.

67.     Ultimately, the court-appointed experts tracking Wexford in *Lippert* concluded that the collegial review process was a "patient safety hazard" that should be abandoned entirely.

68.     A 2019 report confirmed that Wexford's collegial review required approval for all non-emergency offsite referrals and that requests for approval were submitted to offsite reviewers who had neither examined the patient nor had access to the full medical record. The report concluded that collegial review delayed necessary consultations and testing and posed risks to patient safety.

69.     Despite these repeated findings, Wexford chose to continue using collegial review and similar utilization management practices in New Mexico prisons, including CNMCF, during the period of Mr. Romero's incarceration.

70.     Under Wexford's Professional Services Contract #20-770-1200-0043 with NMCD, Wexford was required to pay 100% for all referrals to outside providers but paid $0.00 if a patient

15

was hospitalized for 24 hours or more (covered by Medicaid), creating a perverse financial incentive to deny care until patients require emergency hospitalization—exactly what occurred with Plaintiff.

71.    Upon information and belief, from February 9 through February 17, 2023, the prolonged delay in escalating Plaintiff's care to emergency outside hospital evaluation, despite his known diagnosis of active spinal osteomyelitis and progressively worsening neurological symptoms, was consistent with and influenced by Wexford's profit-driven utilization management practices, including its collegial review system, under which decisions regarding escalation of care and outside hospitalization were made by individuals who did not examine or evaluate Plaintiff and who lacked direct knowledge of his deteriorating condition.

72.    Even when escalation was not formally denied in Plaintiff's case, these practices shaped and constrained provider behavior at CNMCF. Because escalation requests were routinely delayed, denied, or discouraged by Wexford's centralized review system, CNMCF providers learned to anticipate resistance and, over time, delayed or avoided initiating escalation requests, even during medical emergencies. This learned and foreseeable pattern of delayed escalation was a moving force behind the failure to obtain timely outside hospital evaluation for Plaintiff between February 9 and February 17, 2023.

**Systematic Healthcare Failures: Chronic Understaffing and Audit Violations**

73.    During the period relevant to this Complaint, CNMCF's medical unit was critically understaffed. A December 15, 2022, audit identified 21 major violations of healthcare standards, including expired medications, inadequate temperature monitoring, improper medication administration, inadequate documentation, chronic understaffing of registered nurses, and multiple facility maintenance issues.

16

74.    CNMCF operated under severe staffing crisis during February 2023, with multiple positions marked as "SHUTDOWN" due to inability to fill essential positions, night shift overtime ranging from 82.5 to 275 hours, and day shift overtime from 94 to 247 hours, directly impacting medical care delivery and emergency response capabilities.

75.    A follow-up audit in April 2023 resulted in $15,000 in fines imposed on Wexford for continued violations including temperature monitoring failures, expired medications, inadequate documentation, unsigned telephone orders, and inadequate documentation of allergies.

76.    Wexford's chronic understaffing during February 2023, with MD/DO hours varying from 75.25 to 180.75 hours per week and multiple essential positions remaining unfilled, violated contractual obligations to maintain adequate staffing and 24/7 medical coverage.

77.    Defendant Wence Asonganyi, as NMCD's Health Services Administrator, personally reviewed these audit findings and financial "paybacks" reflecting dangerously low staffing levels at CNMCF, yet failed to take corrective action, require staffing adjustments, or otherwise ensure that care needs were being met. His review of contractor performance was cursory and amounted to rubber-stamping Wexford's continued noncompliance.

78.    Defendant Alisha Tafoya Lucero, as NMCD Secretary, was aware that during fiscal year 2022, nearly one in four correctional officer positions in NMCD facilities were vacant, representing approximately 309 unfilled posts statewide. This figure was publicly reported by NMCD and presented by Defendant Lucero herself to the House Appropriations and Finance Committee.

79.    Despite acknowledging these severe shortages, Defendant Lucero failed to take reasonable corrective action, including failing to enforce contract compliance, discipline staff, or implement procedures to ensure timely emergency transport, to mitigate their foreseeable impact

17

on inmate health and safety, continuing to operate NMCD facilities at dangerously low staffing levels that left essential functions, including providing correctional officers to accompany off-site medical referrals, unfulfilled.

80.     The critical understaffing directly caused or contributed to the failures to provide adequate medical care to Mr. Romero and directly caused or contributed to the delays in obtaining medical care for Mr. Romero.

### Post-Hospitalization Return to CNMCF

81.     On July 28, 2023, Plaintiff was discharged from UNMH and returned to CNMCF with ongoing medical needs including surgical incision care, continued osteomyelitis treatment, extensive spinal hardware from spine to pelvis, and documented physical limitations requiring specialized post-operative care.

82.     Despite requiring specialized post-operative care, Plaintiff was immediately placed in Restrictive Housing Unit rather than appropriate medical housing, demonstrating continued deliberate indifference, causing additional injury to Mr. Romero.

83.     Defendants failed to provide Plaintiff with required post-surgical follow-up care with his surgeon at the six-month mark following his spinal surgeries, compromising his long-term recovery.

### Permanent Injuries and Ongoing Damages

84.     As a direct result of Defendants' deliberate indifference, Plaintiff now suffers permanent disabilities including complete numbness in both feet, "drop foot" condition in his right foot requiring a cane for mobility, weakness in bilateral lower extremities with severely limited flexion and extension (documented as 1/5 flexion/extension at knees and 3/5 hip flexion and extension), and chronic muscle spasms extending from his lumbar spine to his toes.

18

85.     Plaintiff endures constant severe pain rated 10/10 that he describes as "killing" him, with "really sharp pains" and "real sharp cramps" in his legs.

86.     Plaintiff cannot sit comfortably, has difficulty rising from a lying position, suffers from a "real bad limp," is unable to feel his feet (describing them as "dead"), and requires ongoing assistance with basic daily activities.

87.     Plaintiff's permanent spinal hardware extending from his spine to his pelvis, ongoing need for specialized medical care, and physical limitations requiring assistive devices will prevent him from engaging in many forms of employment, resulting in substantial loss of future earning capacity.

## Exhaustion of Administrative Remedies

88.     Plaintiff was transferred to CNMCF on February 9, 2023, and was emergently hospitalized at University of New Mexico Hospital on February 17, 2023—a period of only eight days during which his condition rapidly deteriorated to a life-threatening medical emergency.

89.     Plaintiff remained continuously hospitalized at UNMH from February 17, 2023, through July 28, 2023, a period of 159 consecutive days during which he underwent two major spinal surgeries and suffered life-threatening post-operative complications.

90.     During his hospitalization, Plaintiff was physically incapable of filing grievances through CNMCF's administrative process, as he was not housed at the facility and was instead undergoing intensive medical treatment including major surgical procedures, post-operative recovery in intensive care, and treatment for serious complications.

91.     Neither Plaintiff nor his wife could communicate with each other or with Plaintiff's attorney from February 2023 through at least June 2023, despite repeated attempts to contact him. Notices of Claim sent to NMCD on March 22, May 4, and May 8, 2023, documented that Plaintiff's

wife and attorney were unable to locate or speak with him, and expressed growing concern that he might be deceased or terminally ill.

92.     Upon information and belief, administrative remedies were unavailable to Plaintiff during the relevant time period because: (a) he was emergently hospitalized within eight days of arriving at CNMCF; (b) he was physically incapacitated during his 159-day hospitalization undergoing major surgeries and recovering from life-threatening complications; (c) he was denied contact with his wife and attorney who could have assisted him in filing grievances; and (d) the constitutional violations alleged herein occurred during an acute medical emergency requiring immediate intervention, rendering administrative remedies inadequate to address the harm.

93.     Even if Plaintiff had been physically capable of filing grievances while hospitalized, he was not in NMCD custody during the relevant period and had no access to CNMCF grievance forms, staff, or procedures, rendering the grievance process unavailable in practice.

94.     To the extent exhaustion is required, Plaintiff and his counsel made repeated efforts to notify NMCD officials of Plaintiff's catastrophic medical deterioration and to obtain information regarding his condition and location.

95.     Accordingly, any administrative remedies were unavailable within the meaning of the Prison Litigation Reform Act because the violations occurred during an acute medical emergency and Plaintiff was incapacitated and hospitalized.

## CLAIMS FOR RELIEF

### COUNT I: UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT- 42 U.S.C. § 1983, Fourteenth Amendment
#### (Gallegos, RACDC supervisors/Does)

96.     Plaintiff incorporates by reference all preceding paragraphs.

20

97. During the period described in this Count, Plaintiff was a pretrial detainee housed at the Rio Arriba County Adult Detention Facility.

98. Plaintiff's constitutional right to adequate medical care arose under the Fourteenth Amendment Due Process Clause.

99. Defendant Gallegos was at all relevant times the Warden/Administrator of RACDC and was responsible for ensuring detainees had access to emergency medical transport and for effectuating court-ordered transfers necessary to secure constitutionally adequate medical care.

100. John/Jane Doe Defendants included RACDC supervisory custody staff, transport coordinators, and shift commanders who participated in, approved, or carried out the decision to delay Plaintiff's hospital transport and delay execution of the court-ordered transfer.

101. Defendant Gallegos and John/Jane Doe Defendants were responsible for custody operations, medical transport logistics, and effectuating court-ordered transfers, and each had authority to secure emergency treatment or timely transfer for Plaintiff.

102. Plaintiff suffered from a serious medical need, including active spinal osteomyelitis requiring urgent IV antibiotic treatment and hospital-level monitoring.

103. Defendant Gallegos and the John/Jane Does had actual knowledge that RACDC could not provide the medical treatment Plaintiff required, including through written medical documentation acknowledging the facility's incapacity and through the February 3, 2023 court order finding that Plaintiff required specialized medical care and that RACDC was not properly equipped to provide such care.

104. Despite this knowledge, Defendant Gallegos and the John/Jane Does failed to arrange emergency transport to a hospital and failed to timely effectuate Plaintiff's transfer to a facility capable of providing necessary medical care. Instead, Plaintiff remained confined at

RACDC without IV antibiotics from January 13 through February 9, 2023, including for days after the court's February 3, 2023 order.

105.    Defendant Gallegos and the John/Jane Does' delay and failure to act was not reasonably related to any legitimate governmental objective and constituted unconstitutional punishment in violation of the Fourteenth Amendment Due Process Clause.

106.    As a direct and proximate result of Gallegos and the John/Jane Does' deliberate indifference, Plaintiff suffered catastrophic deterioration, including emergency hospitalization, 159 days of hospitalization, extensive spinal surgeries, permanent neurological injury, severe pain and suffering, and medical expenses exceeding $1.6 million.

### COUNT II: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS- 42 U.S.C. § 1983, Fourteenth Amendment ( Dr. Levi Maes of Roadrunner Health Services, LLC)

107.    Plaintiff incorporates by reference all preceding paragraphs.

108.    During the period described in this Count, Plaintiff was a pretrial detainee housed at the Rio Arriba County Adult Detention Center. His right to adequate medical care arose under the Fourteenth Amendment Due Process Clause, which prohibits punishment and the denial or delay of necessary medical care not reasonably related to a legitimate governmental objective.

109.    Defendant Dr. Levi Maes was the Medical Director at RACDC and was responsible for providing and/or ensuring constitutionally adequate medical care to detainees, including arranging emergency hospital care or transfer when RACDC was unable to provide necessary treatment.

110.    Plaintiff suffered from a serious medical need, including active spinal osteomyelitis requiring urgent intravenous antibiotic treatment and medical monitoring to prevent progression, neurological injury, permanent disability, and death.

111.    Dr. Maes acknowledged in writing that Plaintiff "requires IV antibiotics for an extended period of time" and that the detention center "is unable to provide IV antibiotics," and recommended placement in a facility that could accommodate Plaintiff's medical needs.

112.    Defendant Maes therefore had actual knowledge that Plaintiff required IV antibiotics and that RACDC lacked the capability to provide the medically necessary treatment required to prevent catastrophic harm.

113.    Despite this actual knowledge, Defendant Maes failed to arrange emergency hospital transport for Plaintiff, failed to initiate IV antibiotic treatment, and failed to take reasonable measures to secure timely transfer to a facility capable of providing necessary care.

114.    Instead, Plaintiff remained detained at RACDC without IV antibiotic treatment from January 13 through February 9, 2023, while his spinal infection progressed untreated and his risk of spinal destruction, spinal cord compression, and permanent neurological injury escalated daily.

115.    Defendant Maes's refusal and failure to secure necessary hospital-level care and IV antibiotic treatment constituted deliberate indifference under the failure-to-treat theory, because Plaintiff received no constitutionally adequate treatment for a diagnosed and life-threatening condition.

116.    Defendant Maes's refusal and failure to secure necessary hospital-level care also constituted deliberate indifference under the gatekeeper theory, because he knowingly failed to ensure Plaintiff had timely access to medical treatment beyond RACDC's capability, despite acknowledging in writing that such treatment was required.

117. Defendant Maes's acts and omissions were not reasonably related to any legitimate governmental objective and amounted to unconstitutional punishment in violation of the Fourteenth Amendment Due Process Clause.

118. As a direct and proximate result of Defendant Maes's deliberate indifference, Plaintiff suffered catastrophic deterioration, including emergency hospitalization, 159 days of hospitalization, extensive spinal surgeries, permanent neurological injury, severe pain and suffering, and medical expenses exceeding $1.6 million.

### COUNT III: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS- 42 U.S.C. § 1983, Fourteenth Amendment (Paul Swoboda, MD, and Joyce Rodriguez, RN, of Wexford Health Sources, Inc.)

119. Plaintiff incorporates by reference all preceding paragraphs.

120. During the period described in this Count, Plaintiff was a pretrial detainee held on a CJ hold at Central New Mexico Correctional Facility.

121. Plaintiff's right to adequate medical care arises under the Fourteenth Amendment Due Process Clause, which prohibits punishment and prohibits denial or delay of necessary medical care.

122. Plaintiff suffered from a serious medical need, including active spinal osteomyelitis requiring urgent and continuous IV antibiotic treatment and medical monitoring to prevent catastrophic progression, spinal cord compression, permanent neurological injury, and death.

123. Plaintiff arrived at CNMCF on February 9, 2023, with active, diagnosed spinal osteomyelitis documented in his transfer paperwork and CJ Hold file, requiring immediate and continuous IV antibiotic treatment.

124. Defendant Paul Swoboda, MD, was the CNMCF Medical Director and was responsible for directing and supervising Plaintiff's medical care, including timely escalation of

care, emergency referral decisions, and arranging outside hospital evaluation when Plaintiff's condition exceeded the facility's capability to treat.

125. Defendant Joyce Rodriguez, RN, was a registered nurse at CNMCF who was responsible for assessing Plaintiff, documenting his symptoms, and ensuring appropriate escalation of care when Plaintiff exhibited signs of medical emergency.

126. From February 9 through February 17, 2023, Plaintiff exhibited clear and escalating "red flag" symptoms of spinal cord compression and neurological deterioration, including worsening back pain, progressive lower extremity spasms and contractures preventing ambulation, paresthesia, and ultimately the inability to rise to a sitting position.

127. These symptoms are well-recognized warning signs of spinal cord compression requiring immediate emergency intervention.

128. Defendants Swoboda and Rodriguez were aware of Plaintiff's serious medical condition, aware of the substantial risk of catastrophic neurological injury, and aware that CNMCF was not capable of definitively diagnosing or treating spinal cord compression within the facility.

129. Despite this knowledge, Defendants Swoboda and Rodriguez failed to take reasonable measures to secure timely emergency transport and outside hospital evaluation, and instead delayed escalation of care for eight days while Plaintiff's condition progressively deteriorated.

130. Defendants did not arrange emergency transport until February 17, 2023, when Plaintiff's condition had worsened to the point that he was unable to rise to a seated position and was documented as having "worsening of condition."

131.   The delay in obtaining emergency outside hospital evaluation constituted deliberate indifference under the failure-to-treat theory because Defendants provided no timely intervention adequate to address Plaintiff's known medical emergency.

132.   The delay also constituted deliberate indifference under the gatekeeper theory because Defendants failed to fulfill their duty to ensure Plaintiff had timely access to hospital-level evaluation and treatment that was plainly required by his deteriorating neurological condition.

133.   Defendants Swoboda and Rodriguez acted under color of state law.

134.   Defendants Swoboda and Rodriguez's acts and omissions amounted to unconstitutional punishment in violation of the Fourteenth Amendment Due Process Clause.

135.   As a direct and proximate result of Wexford Defendants' deliberate indifference, Plaintiff suffered catastrophic deterioration, including emergency hospitalization, 159 days of hospitalization, extensive spinal surgeries, permanent neurological injury, severe pain and suffering, and medical expenses exceeding $1.6 million.

**COUNT IV: SUPERVISORY LIABILITY- 42 U.S.C. § 1983, Fourteenth Amendment**
**(Wence Asonganyi, Alisha Tafoya Lucero, and Robert Nilius)**

136.   Plaintiff incorporates by reference all preceding paragraphs.

137.   Defendants Asonganyi, Tafoya Lucero, and Nilius, through their personal involvement, deliberate acts, and knowing failure to supervise and correct unconstitutional medical-care practices by NMCD's contractors, directly caused and facilitated the denial and delay of necessary medical care to Plaintiff while he was a pretrial detainee at CNMCF in violation of the Fourteenth Amendment Due Process Clause.

138.   Each supervisory Defendant knew of a substantial risk of serious harm to Plaintiff and, despite having authority and responsibility to intervene, failed to take reasonable measures to prevent the ongoing constitutional violations.

139. Defendant Wence Asonganyi, as NMCD's Health Services Administrator, was personally responsible for overseeing Wexford's compliance with NMCD policies and the Professional Services Contract, monitoring facility staffing levels, reviewing daily hospital reports, and ensuring appropriate care plans were implemented when patients returned from outside hospitals.

140. Defendant Asonganyi had actual knowledge through audit reports of Wexford's systematic failures at CNMCF, including 21 major healthcare violations documented in December 2022 and $15,000 in fines imposed in April 2023.

141. Despite this actual knowledge of Wexford's systematic failures and dangerous staffing levels, Defendant Asonganyi failed to take corrective action, require staffing adjustments, or ensure that care needs were being met, allowing the pattern of constitutional violations to continue.

142. On July 28, 2023, UNMH prepared and transmitted to NMCD a discharge summary documenting Mr. Romero's discharge following 159 days of hospitalization and two major spinal surgeries. The discharge summary documented Mr. Romero's complex post-surgical medical needs, listed multiple discharge medications including seizure medications and pain management, and recommended continued frequent ambulation.

143. Defendant Asonganyi, through his responsibility to review daily hospital reports and ensure appropriate care plans for returning patients, had actual knowledge of Mr. Romero's serious post-surgical medical needs. Yet the same day Mr. Romero returned to CNMCF, he was placed in Restrictive Housing Unit rather than appropriate medical housing for his documented post-surgical condition and medical needs.

27

144. Despite his duty to ensure implementation of discharge plans and continuity of care, Defendant Asonganyi failed to verify that Mr. Romero received required medical monitoring, post-surgical follow-up care with his surgeons at the six-month mark, compromising his long-term recovery and demonstrating deliberate indifference to his serious medical needs.

145. Defendant Asonganyi's cursory review of contractor performance, failure to take corrective action despite documented systematic failures, and failure to ensure appropriate post-surgical care despite actual knowledge of Mr. Romero's needs demonstrates deliberate indifference establishing liability under § 1983.

146. Defendant Alisha Tafoya Lucero, as NMCD Secretary, exercised final policymaking authority over NMCD's oversight of Wexford's medical care, contracts with private medical providers, and enforcement of compliance with constitutional standards.

147. Defendant Lucero was aware of severe correctional officer vacancies (309 unfilled posts statewide, nearly one in four positions) that directly impacted the ability to execute medical transports and provide hospital escorts.

148. Despite publicly acknowledging these staffing shortages, Defendant Lucero failed to take reasonable corrective action, continuing to operate NMCD facilities at dangerously low staffing levels that prevented timely access to emergency medical care.

149. Defendant Robert Nilius, as Warden of CNMCF, was responsible for overall facility operations, ensuring adequate security staffing for medical transports, and overseeing emergency response procedures.

150. Defendant Nilius allowed CNMCF to operate with chronic understaffing and systematic shutdown of hospital escort positions during February through July 2023, directly compromising the facility's ability to execute timely medical transports.

28

151.   Defendant Nilius reviewed and signed the February 17, 2023 Serious Incident Report marking "No further action required," despite obvious failure to provide timely emergency care during the eight days preceding the transport.

152.   On March 22, May 4, and May 8, 2023, Defendant Nilius personally received three separate Notices of Claim from Plaintiff's counsel specifically alleging "deliberate indifference to Mr. Romero's serious medical needs" and warning of constitutional violations. These notices informed Defendant Nilius that Mr. Romero's wife had been unable to contact him since February 2023, that counsel was "growing increasingly concerned about his medical condition," and that Mr. Romero had suffered catastrophic injuries requiring 159 days of hospitalization and two major spinal surgeries.

153.   Despite actual knowledge of these serious constitutional violations, on July 28, 2023, when Mr. Romero was discharged from UNMH following his prolonged hospitalization and major spinal surgeries, Defendant Nilius's subordinate Lt. Hope Benavidez, acting under Defendant Nilius's authority and policies, placed Mr. Romero in Restrictive Housing Unit due to gang affiliation concerns rather than appropriate medical housing for his serious post-surgical needs requiring specialized care.

154.   Defendants Asonganyi, Tafoya Lucero, and Nilius, through their personal participation in the deprivation of Plaintiff's constitutional rights, their deliberate acts and omissions, and their knowing failure to prevent constitutional violations despite actual knowledge, are each personally liable under § 1983.

### COUNT V: MONELL LIABILITY - 42 U.S.C. § 1983 - Custom, Policy, or Practice
### (Board of County Commissioners of Rio Arriba County)

155.   Plaintiff incorporates by reference all preceding paragraphs.

156. Defendant Rio Arriba County maintained a custom and practice of housing pretrial detainees with serious medical conditions requiring specialized care that exceeded the facility's capabilities, without arranging timely transfers to facilities capable of providing necessary treatment.

157. Despite Dr. Maes's written acknowledgment on behalf of Roadrunner that the facility could not provide IV antibiotics and a court order finding the facility "not properly equipped," Rio Arriba County continued to house Mr. Romero for six additional days after the court order, consistent with its custom and practice of delaying medically necessary transfers and demonstrating a custom of prioritizing detention over constitutionally required medical care.

158. Rio Arriba County contracted with Roadrunner Health Services to provide medical care, yet failed to ensure that the contractor maintained adequate capabilities to treat detainees with serious medical conditions or to arrange timely transfers when the facility's limitations were known.

159. Rio Arriba County was on actual notice that Plaintiff required IV antibiotics and that the detention center could not provide them, yet County officials failed to implement any system to ensure timely emergency hospital transport or immediate transfer for detainees whose medical needs exceeded facility capabilities.

160. Rio Arriba County's policies, customs, and practices were the moving force behind the deprivation of Plaintiff's Fourteenth Amendment substantive due process right to be free from punishment, including the denial and delay of necessary medical care, and directly caused the catastrophic deterioration of his condition.

161. Rio Arriba County's customs and policies were maintained with deliberate indifference to their known or obvious consequences, warranting Monell liability.

## COUNT VI: MONELL LIABILITY - 42 U.S.C. § 1983 - Custom, Policy, or Practice
### (Wexford Health Sources, Inc.)

162.    Plaintiff incorporates by reference all preceding paragraphs.

163.    Defendant Wexford maintained and enforced corporate policies and customs of failing to meet minimum constitutional standards of care at NMCD facilities motivated by Wexford's business model of cutting costs of operation, staffing, recordkeeping, transfers and referrals.

164.    Wexford maintained a centralized utilization management system known internally as "collegial review," which required upper-level approval for outside consultations, diagnostic imaging, and specialty referrals. Even when facility-level providers sought to refer a patient for outside care, the request had to pass through multiple layers of corporate review and approval, delaying or effectively denying necessary medical attention.

165.    Court-appointed experts in *Lippert v. Ghosh* concluded that Wexford's collegial review process in Illinois was a "patient safety hazard" that created "breakdowns in almost every area," including delays in identifying when offsite care was needed and complete absence of timely follow-up once patients returned from outside facilities. These findings put Wexford on notice that collegial review created dangerous delays in care and posed a substantial risk of serious harm.

166.    The vast majority of Wexford's denials of outside medical care in Illinois were later overturned upon independent review, confirming how this bureaucratic system routinely interfered with timely and appropriate treatment.

167.    Despite these findings, Wexford deliberately chose to continue using its collegial review in New Mexico prisons, including CNMCF, during Mr. Romero's incarceration, despite knowing or having reason to know it posed risks to patient safety.

31

168. By conditioning off-site referrals on corporate approval, discouraging escalation through cost-containment incentives, and operating CNMCF with chronically inadequate staffing, Wexford created a system in which providers predictably delayed escalation of care even in the face of obvious medical emergencies. Plaintiff's prolonged deterioration before emergency transport was the foreseeable result of these policies and practices.

169. Wexford maintained a custom and practice of chronic understaffing, with CNMCF operating at dangerously low staffing levels during February 2023 (MD/DO hours varying from 75.25 to 180.75 hours per week with multiple essential positions unfilled), violating contractual obligations and constitutional requirements.

170. Wexford also maintained a custom and practice of failing to adequately train and supervise CNMCF medical staff regarding emergency escalation, referral, and transport protocols for patients with spinal infections and neurological deterioration, resulting in predictable delays in obtaining hospital-level care and advanced imaging even when such care was urgently required.

171. Wexford was repeatedly cited and fined for failures in staffing and medical compliance at CNMCF, demonstrating Wexford's knowledge that its practices created an unreasonable risk of serious harm.

172. These policies were promulgated by Wexford corporate leadership and implemented throughout NMCD facilities.

173. These policies, customs, and practices were a moving force behind the deprivation of Plaintiff's Fourteenth Amendment due process rights while he was a pretrial detainee at CNMCF and directly caused the injuries suffered by Plaintiff.

174. Wexford's customs and policies were maintained with deliberate indifference to their known or obvious consequences, warranting Monell liability.

**COUNT VII: MONELL LIABILITY - 42 U.S.C. § 1983 - Custom, Policy, or Practice**
**(Roadrunner Health Services, LLC)**

175.    Plaintiff incorporates by reference all preceding paragraphs.

176.    During the period relevant to this Count, Plaintiff was a pretrial detainee housed at the Rio Arriba County Adult Detention Center ("RACDC"). Plaintiff's right to adequate medical care arises under the Fourteenth Amendment Due Process Clause.

177.    Defendant Roadrunner Health Services, LLC ("Roadrunner") was at all relevant times the contracted medical provider responsible for delivering medical care to detainees at RACDC and for arranging hospital-level care, specialty care, and emergency transfer when medically necessary.

178.    Roadrunner acted under color of state law because it performed a traditionally exclusive government function by providing constitutionally required medical care to detainees confined in a county detention facility.

179.    Plaintiff suffered from an objectively serious medical need, including active spinal osteomyelitis requiring urgent hospital-level care, including continuous intravenous ("IV") antibiotic treatment, diagnostic monitoring, and timely escalation of care to prevent irreversible neurological injury, paralysis, sepsis, or death.

180.    Roadrunner, through its agents and medical staff, including its Medical Director, Defendant Dr. Levi Maes, had actual knowledge that Plaintiff required IV antibiotics for an extended period of time and that RACDC was unable to provide IV antibiotic treatment.

181.    Roadrunner nevertheless failed to provide Plaintiff with constitutionally adequate medical care, failed to arrange emergency transport to a hospital to initiate necessary IV antibiotics, and failed to ensure Plaintiff was timely transferred to a facility capable of providing the required care.

182.    Upon information and belief, Roadrunner maintained, enforced, and permitted customs, policies, and practices at RACDC that resulted in the unconstitutional denial and delay of necessary medical care for detainees with serious medical needs, including but not limited to:

a. A policy, custom, or practice of failing to provide detainees with timely emergency transport to outside hospitals even when detainees suffered from diagnosed conditions requiring hospital-level treatment;

b. A policy, custom, or practice of continuing to detain medically unstable detainees at RACDC despite actual knowledge that RACDC lacked the capability to provide required treatment, including IV antibiotics;

c. A policy, custom, or practice of operating without adequate medical staffing, equipment, and protocols necessary to deliver urgent care and to ensure continuity of care for detainees with severe infections;

d. A policy, custom, or practice of delaying necessary medical escalation and transfer decisions due to institutional convenience, staffing limitations, or cost considerations, rather than medical necessity;

e. A policy, custom, or practice of failing to train, supervise, and discipline medical staff regarding the urgent and emergent nature of spinal infections and the required steps to secure immediate hospital-level evaluation and treatment; and

f. A policy, custom, or practice of failing to implement adequate procedures to ensure detainees with diagnosed life-threatening infections received timely IV antibiotics and hospital-level monitoring.

183.    Upon information and belief, Roadrunner's policies, customs, and practices were promulgated or tolerated by Roadrunner's supervisory personnel and medical leadership,

including its Medical Director at RACDC, and reflected deliberate indifference to the known and obvious risk that detainees would suffer catastrophic harm when urgent treatment was withheld.

184. Roadrunner's policies, customs, and practices were the moving force behind the deprivation of Plaintiff's Fourteenth Amendment rights, including the prolonged deprivation of medically necessary IV antibiotic treatment from January 13, 2023 through February 9, 2023, despite confirmed diagnosis of osteomyelitis and explicit written acknowledgment that RACDC could not provide IV antibiotics.

185. As a direct and proximate result of Roadrunner's unconstitutional policies, customs, and practices, Plaintiff suffered catastrophic deterioration of his spinal infection, requiring emergency hospitalization, 159 days of hospitalization, multiple major spinal surgeries, life-threatening complications, permanent neurological injury, severe pain and suffering, and medical expenses exceeding $1.6 million.

186. Roadrunner's conduct was undertaken with deliberate indifference to Plaintiff's constitutional rights, entitling Plaintiff to compensatory damages and, to the extent permitted by law, punitive damages.

187. Roadrunner's policies and customs resulted in the unconstitutional punishment of detainees by denying and delaying necessary medical care.

### COUNT VIII: PUNITIVE DAMAGES 42 U.S.C. § 1983

188. Plaintiff incorporates by reference all preceding paragraphs.

189. The acts and omissions by individual Defendants Swoboda, Rodriguez, Dr. Maes, Asonganyi, Tafoya Lucero, and Nilius as previously outlined were intentional, malicious, willful, wanton, and in gross and reckless disregard of Plaintiff's constitutional rights.

35

190. These individual Defendants acted with deliberate indifference and reckless disregard for Plaintiff's constitutional rights, warranting an award of punitive damages to punish their conscience-shocking conduct and deter similar violations.

191. Defendants Wexford Health Sources, Inc., and Roadrunner Health Services, LLC, as corporate entities, maintained policies and customs with reckless disregard for the constitutional rights of detainees, warranting punitive damages against these corporations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally, as follows:

1. Compensatory damages against all Defendants in an amount to be determined at trial for physical pain, emotional distress, permanent injury, loss of quality of life, medical expenses, and loss of earning capacity;

2. Punitive damages against all individual Defendants in their individual capacities and against Wexford Health Sources, Inc. and Roadrunner Health Services, LLC, for acting with deliberate indifference and reckless disregard of Plaintiff's constitutional rights;

3. Attorney's fees and costs pursuant to 42 U.S.C. § 1988 and other applicable laws;

4. Pre-judgment and post-judgment interest as allowed by law;

5. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

COLLINS & COLLINS, P.C.

***/s/ Rebekah Wright***
Rebekah Wright
Parrish Collins
P.O. Box 506
Albuquerque, NM 87103
(505) 242-5958
rebekah@collinsattorneys.com
parrish@collinsattorneys.com

-and-

GUEBERT PIAZZA & JUNKER, P.C.

Elizabeth Piazza
P.O. Box 93880
Albuquerque, NM 87109
(505) 823-2300
elizabeth@gpjlegal.com

***Attorneys for Plaintiff***

37